**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **TATERA T. HOOKS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 16 CV 2888** |
| **v.** ) | |
| ) | **Magistrate Judge Michael T. Mason** |
| **CAROLYN W. COLVIN, Acting** ) | |
| **Commissioner of the U.S. Social** ) | |
| **Security Administration,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Claimant Tatera Hooks ("Claimant") seeks reversal of a final decision of the

Commissioner of the Social Security Administration (the "Commissioner") denying her

claim for Supplemental Security Income ("SSI").  The Commissioner has filed a cross-

motion, asking that this Court affirm the previous decision.  This Court has jurisdiction to

hear this matter pursuant to 42 U.S.C. §§ 1383(c) and 405(g).  For the reasons that

follow, Claimant's request for summary judgment (Dkt. 14) is granted and the

Commissioner's request (Dkt. 18) is denied.

**I.  BACKGROUND**

    **A.  Procedural History**

Claimant was granted SSI on July 10, 1996 at the age of two.[1]  Pursuant to 42

U.S.C. § 1382c(a)(3)(H)(iii), Claimant's eligibility for disability benefits was re-assessed

shortly after she turned eighteen to determine whether she was disabled under the

definition of disability for adults.  *See also* 20 C.F.R. § 416.987.  On July 27, 2012, it

---

[1] It is unclear why Claimant initially received SSI benefits at age two.  (R. 72.)

was determined that she was not disabled as of July 1, 2012 and her SSI benefits were terminated. (R. 73-76.) That determination was upheld on reconsideration by a Disability Hearing Officer. (R. 81-93.) Claimant filed a request for a hearing before an Administrative Law Judge ("ALJ"), (R. 95-96), which was held before ALJ James D. Wascher on July 15, 2014. (R. 38-68.) On September 15, 2014, the ALJ issued a written decision finding that Claimant's disability ended on July 1, 2012, and that she had not become disabled again since that date. (R. 22-33.)

Claimant filed a timely appeal with the Appeals Council, which was denied. (R. 1-6.) At that point, the ALJ's decision became the final decision of the Commissioner. This action followed and the parties consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## B. Medical Evidence

### 1. Treating Records

Claimant maintains that she continues to be disabled due to a learning disability, ADHD, mental health problems, and headaches. (R. 72.) Pediatric treatment records dating back to her birth are mostly illegible, but appear to reflect periodic wellness visits and school physicals. (R. 230-36.)

Records from Dr. Sanjida Mirza dating back to 2011 also reveal periodic visits for vaccinations, lab tests, blood pressure checks, minor ailments and skin problems. (R. 238-255.) Her gait was documented as normal in June 2011. (R. 250.) In July 2011, Dr. Mirza completed a pre-entrance medical examination for a nursing program at Chicago Public Schools. (R. 247.) All results were documented as normal and Dr.

Mirza certified that Claimant's health was "satisfactory to participate in or perform nursing activities." (*Id.*)

In January 2012, Claimant reported to Dr. Mirza that she had recently been in a car accident. (R. 245-46.) She was seen at the University of Chicago, where her head, neck, back, and chest x-rays were normal. (*Id.*) She did tell Dr. Mirza that she had been suffering from headaches and pain in her neck since the accident. (*Id.*) She was taking Vicodin and a muscle relaxant. (*Id.*) A physical examination was primarily normal, and she had no problem walking or bending. (*Id.*) She did show pain upon extension and rotation of her neck. (*Id.*) Her right hand grasp was slightly weakened . (*Id.*)

Records reflect that Claimant underwent therapy and mental health treatment through Mercy Medical Center beginning in August 2012 after the Community Mental Health Council closed.[2] At the time of her initial diagnostic visit, Claimant was a high school senior living with her mother and brother. (R. 301.) She provided the therapist with a note from her mother indicating that Claimant talked to herself, had lead poisoning as a child, has difficulty taking care of herself, and is easily overwhelmed. (R. 297.) Claimant herself reported a history of ADHD and intellectual disability. (*Id.*) She had previously taken Ritalin and an anti-depressant. (*Id.*) She often felt frustrated and irritable. (R. 300.) Through treatment, Claimant hoped to feel less depressed, learn to manage her anger, and improve her sleep. (*Id.*)

Therapist Erin Magoon completed a full mental health assessment in August 2012. (R. 300-01.) Claimant's speech was pressured, her mood irritable, and her affect

---

[2] As explained below, neither Claimant nor the Commissioner were able to obtain treatment records from the Community Mental Health Council. (R. 46-47.)

restricted.  (R. 301.)  Her thought process was logical and coherent.  (*Id.*)  A cognitive assessment yielded fair to good results.  (*Id.*)  Magoon assessed depressive disorder, not otherwise specified, ADHD, and a GAF score of 57 (indicating moderate symptoms).  (*Id.*)  She recommended a psychiatric evaluation and therapy.  (*Id.*)

At her next therapy session with Magoon later that month, Claimant expressed her desire to go to college to pursue a career in the medical field.  (R. 299.)  She was much more comfortable during this session and explained that she was in a "bad mood" at her last visit.  (*Id.*)  By September, she was expressing some feelings of anger and frustration, as well as sleep disturbances.  (R. 303.)  The following month, she expressed similar feelings of anger and frustration, in particular while at school.  (R. 304.)

Claimant underwent a psychiatric evaluation with Dr. Robert Channon in October 2012.  (R. 306.)  Her chief complaints were documented as "bad temper, poor sleep and emotional lability especially pronounced since stopping Prozac and Depakote" several months prior.  (*Id.*)  Her grades in school ranged from Bs to Ds.  (*Id.*)  She used to take piano lessons with her grandmother and practice five to seven hours daily, but stopped after her grandmother passed away the year before.  (*Id.*)  Dr. Channon noted that Claimant was alert, verbal, coherent, and forthcoming, with no psychosis, or suicidal or homicidal ideations.  (*Id.*)  There was no evidence of anger or hyperactivity during the session.  (*Id.*)  Dr. Channon appeared to asses an unspecified episodic mood disorder, and prescribed Prozac and Depakote.  (*Id.*)

A few weeks later, Claimant reported to her therapist that she was feeling less irritable and sleeping better since starting the medication.  (R. 307.)  The following

month, November 2012, Claimant explained that she lashed out at her teacher on the one day she forgot to take her medication. (R. 308.) Her therapist encouraged her to continue taking her medication every day. (*Id.*) Claimant was otherwise focused on college and awaiting the results of the ACT exam. (*Id.*)

By January 2013, Claimant was stressed out about college applications and had stopped taking her medication for the past few days. (R. 310.) She was encouraged to verbalize her stressors and resume medication. (*Id.*) She was feeling better by the end of the therapy session. (*Id.*) Her mood was much better a few weeks later because she had resumed taking her medication. (R. 311.) She had been working hard on her college and scholarship applications. (*Id.*) Over the next few visits in early 2013, she expressed frustration with high school, but was "trying to stay calm." (R. 312-14.) She was still taking her medication, which she reported makes her mood more stable. (R. 313-14.) She continued to look forward to college. (R. 313.)

The record also includes treatment notes from January 2013 through June 2014 covering Claimant's continued visits with psychiatrist Dr. Channon. (R. 281-296.) Dr. Channon was of the opinion that Claimant suffered from bipolar disorder, but consistently described her disorder as "stable" or "improved." (*Id.*) He always recommended that she continue with her medication and follow-up every few months with occasional visits. (*Id.*)

Specific notes reveal that Claimant's mood was good in January 2013, which she attributed to her medication. (R. 281.) A mental status exam yielded a normal range of results. (*Id.*) By June 2013, Claimant had resumed playing the piano, graduated high

school, and received a full scholarship to Chicago State University.  (R. 283.)  She had been taking her medications regularly.  (*Id.*)

Claimant returned to see Dr. Channon in September 2013 and reported some irritability, as well as drowsiness as a result of her medication.  (R. 285.)  During the visit, her speech was spontaneous, her mood dysphoric, and her judgment and insight were noted as limited.  (*Id.*)  Her concentration and attention were average, though her mood was labile.  (*Id.*)  By her next visit in November 2013, Claimant's mood and sleep had improved and she was doing well at Chicago State.  (R. 287.)  She continued to play piano in her free time.  (*Id.*)  A mental status exam was normal.  (*Id.*)  Similar results were reported at Claimant's next few visits with Dr. Channon.  (R. 289-294.)  At times, she did report continued sleep disturbances, but explained that she generally had enough energy.  (R. 289, 291.)

In June 2014, Claimant reported she had completed the spring semester at Chicago State and planned to take summer school.  (R. 295.)  Her mood had been "mostly good," though she complained of occasionally feeling "unstable/grumpy."  (*Id.*)  Dr. Channon described her judgment and insight as limited and her affect as blunted, but appropriate.  (*Id.*)

### 2.    Agency Records

Dr. Norton Knopf performed a consultative mental examination on June 26, 2012.  (R. 256-62.)  When asked what her disability was, Claimant explained that she has a learning disability, cannot count well, and has "anger issues."  (R. 257.)  She reported she would be entering 12th grade in the fall in regular education classes.  (*Id.*)  She denied having any friends, and was doing "nothing" during her summer break.  (*Id.*)

She watches T.V. occasionally.  (*Id.*)  She explained that her mom helps her bathe and dress.  (*Id.*)  She said she does not cook, do laundry, take public transportation or shop by herself.  (*Id.*)  She does wash dishes, take the trash out, and clean.  (*Id.*)  According to claimant, she was in "okay health" and her behavior was "good."  (*Id.*)

Dr. Knopf reported Claimant had a normal gait and no speech or articulation problems.  (R. 257.)  Dr. Knopf administered the Wechsler Adult Intelligence Scale – Fourth Edition ("WAIS-IV").  (*Id.*)  According to Dr. Knopf, Claimant was minimally cooperative during the examination, often saying "don't know" to certain questions when she did in fact know the answer.  (*Id.*)  She also hummed to herself during much of the exam.  (*Id.*)  In any event, the WAIS-IV revealed a full scale IQ of 65, leaving Claimant's general cognitive ability in the "extremely low range of intellectual functioning."  (R. 259.)  As a result, Claimant "may experience great difficulty in keeping up with her peers in a wide variety of situations that require thinking and reasoning abilities."  (*Id.*)  Dr. Knopf assessed "mild mental retardation."  (*Id.*)

The other portions of the WAIS-IV revealed that Claimant's verbal comprehension is in the borderline range; her perceptual reasoning is in the extremely low range; her working memory is in the extremely low range; and her processing speed is in the low average range.  (R. 259-260.)  Dr. Knopf believed that Claimant "may not have been motivated to her best" during the exam.  (R. 257.)  As such, he "considered these scores minimal."  (R. 260.)  However, he ultimately assessed "mild mental retardation." [3]  (R. 259.)

---

[3]  The term "mental retardation" has since been replaced with "intellectual disability" in both the SSA's regulations and the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders.  *See* Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46499-01 (Aug. 1, 2013); *Hall v.*

David Voss, PhD, completed a psychiatric review and mental residual functional capacity assessment in July 2012.  (R. 263-280.)  He assessed borderline intellectual functioning.  (R. 264.)  He concluded that Claimant would suffer moderate limitations in activities of daily living and maintaining concentration, persistence or pace, and mild limitations in maintaining social functioning.  (R. 273.)  Dr. Voss was of the opinion that Claimant would be moderately limited in her ability to understand, remember and carry out detailed instructions; maintain attention for extended periods; complete a normal work day and week without interruptions; maintain socially appropriate behavior; respond to changes in the workplace; and set realistic goals and plans independently. (R. 277-78.)  Otherwise, Dr. Voss found no significant limitations.  (*Id.*)  Dr. Voss based his conclusions on Claimant's schooling, daily activities, and the results of the consultative exam.  (R. 275, 279.)

On January 9, 2013, Howard Tin, Psy.D., completed a second psychiatric review technique, ultimately concluding that Claimant suffered from non-listing level intellectual disability.  (R. 213.)  He opined that Claimant suffered mild limitations in activities of daily living, and moderate limitations in maintaining social function, concentration, persistence or pace.  (R. 219.)  More specifically, in a separate mental RFC assessment, Dr. Tin concluded that Claimant was moderately limited in her ability to: understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; work well in proximity to others; interact with the general public; and set realistic goals or make plans.  (R. 223-24.)  In the remaining categories, he found no significant limitations, or

*Florida*, 134 S. Ct. 1986, 1990, 188 L. Ed. 2d 1007 (2014).  We use the former term here only when quoting Dr. Knopf's report.

that there was no evidence of any limitations. (*Id.*) Dr. Tin also based his conclusions on the results of the consultative exam, as well as Claimant's own allegations of capabilities and activities of daily living. (R. 221, 225.) Reviewing physician C.A. Gotway found no evidence of disabling physical limitations, such as headaches. (R. 227-29.)

### C. Claimant's Testimony

Claimant appeared at the hearing before the ALJ in July 2014. (R. 38.) The ALJ first thoroughly advised Claimant of her right to representation at the hearing. (R. 42-44.) After speaking with her mother, Claimant waived her right to representation and decided to move forward with the hearing. (R. 44, 126.)

Claimant first testified that she was unable to obtain any of her treatment records from Community Mental Health Council because the office had closed. (R. 46-47.) She explained that she has been treated at Mercy since that time. (R. 46.)

At the time of the hearing, Claimant was twenty years old. (R. 47.) She graduated from high school in 2013. (R. 47-48.) She testified that she took a mixture of regular and special education classes in high school. (R. 50-51.) During high school, Claimant worked part-time as a bagger at Jewel and as a greeter at Navy Pier. (R. 48-49.) As a greeter, Claimant welcomed guests, gave them directions, and offered water. (R. 49.) Claimant also volunteered for a non-profit organization. (R. 50.)

Since graduating, Claimant has been attending Chicago State University as a full-time student studying pre-med/biological sciences. (R. 47-48.) She failed two classes during the school year, which she was re-taking over the summer. (R. 48.) Claimant explained that she had trouble transitioning from high school to college

because she was no longer receiving as much one-on-one attention.  (R. 53.)  Claimant attempted to participate in a work-study program through Chicago State, but stopped when her grades started to suffer.  (R. 49-50.)  However, Claimant has been doing better in school since she registered with the Office of Abilities, which offers assistance to students with disabilities.  (R. 53.)

Claimant testified that she has been diagnosed with bipolar disorder, for which she takes medication.  (R. 51.)  Without medication, she suffers from mood swings, is unable to focus, has trouble controlling her anger, and feels depressed and anxious.  (R. 51-52.)  Claimant reported that she sees Dr. Channon and Ms. Magoon on a regular basis.  (R. 52.)

Claimant resides with her mother and nine year old brother.  (R. 52.)  Apart from attending class and doing homework, Claimant enjoys reading.  (R. 54.)  She also practices math and works on her foreign language studies.  (*Id.*)  She is responsible for doing her own laundry and keeping up with her homework assignments.  (*Id.*)  Her mother reminds her to take her medication every day.  (*Id.*)  Claimant explained that she can shower and dress on her own, but that she sometimes wears her shirt backwards or her shoes on the wrong feet.  (R. 54-55.)  Claimant does not take public transportation alone due to her anxiety.  (R. 55-56.)  She also does not like to shop on her own.  (R. 56.)

### D.  Claimant's Mother's Testimony

Claimant's mother also testified briefly before the ALJ.  She explained that if Claimant tries to shop by herself, she usually ends up forgetting something at the store or getting short-changed by the clerks.  (R. 56.)  She tries to let Claimant do things on

her own, but explained that she often has trouble focusing on tasks. (R. 57.) According to Claimant's mother, she likes to go to school and is determined to do well. (*Id.*) Claimant receives tutoring assistance at school and gets very upset if she gets low grades. (R. 57-58.)

### E. Vocational Expert's Testimony

The ALJ also elicited testimony from a vocational expert (the "VE"). The VE first classified Claimant as a "younger individual" with a high school degree or better, and with no past relevant work experience. (R. 61.) The ALJ then asked the VE to consider a hypothetical individual of the Claimant's age, education and experience, who can work at all exertional levels, but is limited to performing simple tasks involving no interaction with the general public. (R. 62.) When asked if such an individual could perform any jobs in the national or local economy, the VE explained that she could perform work in the medium, unskilled positions of assembler, cleaner, or dishwasher. (R. 63.)

Next, the ALJ further limited the hypothetical to an individual who can only perform simple, routine, repetitive tasks in a consistent work environment. (R. 64.) The VE testified that the individual could still perform the three previously identified jobs. (*Id.*) The ALJ then limited the individual to a work environment free of fast paced production requirements, that involves only simple work related decisions; few, if any, work place changes; and only brief superficial interaction with co-workers and supervisors. (R. 64-65.) The VE testified that the hypothetical individual would be unable to perform work as an assembler, but could still work as a cleaner or dishwasher, and also as a mail clerk or mail sorter. (R. 65.) If the individual was off

task twenty percent or more of the workday due to mental health symptoms, she would be precluded from all competitive employment. (*Id.*)

Lastly, the VE testified that an individual who could not interact with co-workers or the public would be limited to working in a position such as a night janitor. (R. 67.) An individual who could not interact with supervisors would not be employable. (*Id.*)

## II. ANALYSIS

### A. Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir.1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). We must consider the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). This Court will "conduct a critical review of the evidence" and will not let the ALJ's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (quoting *Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," he "must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ must "sufficiently articulate his assessment of the evidence to assure us that [he] considered the important evidence ... [and to enable] us

to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir.1985)).

### B. Analysis under the Social Security Act

The Social Security Act provides that minors who remain eligible for benefits immediately prior to their eighteenth birthday must have their eligibility re-assessed using the adult disability standard when they turn eighteen. 42 U.S.C. § 1382c(a)(3)(H)(iii); 20 C.F.R. § 416.987. Under the standard for adults, a claimant is considered disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy…" 42 U.S.C. § 1382c(a)(3)(B). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: (1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ applied this five step analysis here. Because this was a redetermination case, the ALJ did not apply step one. (R. 23.) At step two, the ALJ determined that Claimant suffered from the severe impairments of borderline intellectual functioning and bipolar disorder. (R. 24.) Next, at step three, the ALJ concluded that Claimant's impairments did not meet or medically equal the severity of any of the Listings identified by the Commissioner as conclusively disabling, including Listings 12.04 (Affective Disorders) and Listing 12.05 (Intellectual Disability). (R. 24-27.) The ALJ went on to assess Claimant's RFC, ultimately concluding that she could perform a full range of work at all exertional levels, but was moderately limited in the ability to maintain concentration, persistence or pace; was limited to performing simple, routine, repetitive tasks in a work environment free of fast-paced production requirements, involving only simple work-related decisions, and few, if any, workplace changes. (R. 27-31.) Additionally, Claimant could not have any interaction with the public. (*Id.*)

At step four, the ALJ noted that Claimant did not have any past relevant work. (R. 31-32.) Lastly, at step five, the ALJ concluded Claimant could perform work in the national economy such as cleaner/janitor, dishwasher, or mail sorter/clerk. (R. 32.) As a result, the ALJ found that Claimant was no longer disabled as of July 1, 2012. (R. 33.)

Claimant now asks the Court to reverse the ALJ's decision, arguing that (1) the ALJ erred in finding that her impairments did not meet Listing 12.05(C); and (2) that the ALJ erred by failing to fulfill his duty to fully develop the record.

**C. The ALJ's Step Three Assessment Requires Remand.**

Claimant first argues that the ALJ committed reversible error at step three when he found that Claimant's impairments did not meet the criteria of paragraph "C" of Listing 12.05 for "Intellectual Disability."  The Court agrees.

At step three, the ALJ must determine whether a claimant's impairments meet or equal one of the listed impairments presumed by the Social Security Administration ("SSA") to be severe enough to preclude any gainful work.  *Rice v. Barnhart*, 384 F.3d 363, 365 (7th Cir. 2004); 20 C.F.R. pt. 404, subpt. P, App. 1.  "To meet or equal a listed impairment, the claimant must satisfy all of the criteria of the listed impairment." *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).  Again, the claimant bears the burden at step three.  *Id.*

Before assessing Claimant's listing argument, it warrants mention that the SSA recently revised its Listings for mental disorders and significantly overhauled Listing 12.05, which is at issue here.[4]  *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138-01 (Sept. 26, 2016).  As explained by the SSA, the revised Listings became effective January 17, 2017, and are to be applied to new applications filed on or after the effective date, or to claims pending before the SSA on or after the effective date.  *Id.*  As for cases pending on judicial review, the SSA contemplated, "We expect that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions."  *Id.* at n.1.  Given this guidance, the Court will assess Claimant's argument under Listing 12.05(C) as it was written at the time of the ALJ's decision.  *See Rice,* 384 F.3d at 369 n.4 (7th Cir. 2004)

---

[4] In fact, the SSA completely did away with paragraph C of Listing 12.05.  Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138-01 (Sept. 26, 2016).

("Because Listing 1.05(C) was the listing in effect at the time of the ALJ's decision, it is the only listing we need now consider."); *Caruso v. Comm'r of Soc. Sec.*, 99 F. App'x 376, 380 (3d Cir. 2004) ("For purposes of our [Listing] analysis we review the ALJ's decision based upon the law that was in effect at the time of the ALJ's decision.").

At the time of the ALJ's decision, Listing 12.05, titled "Intellectual Disability," provided, in relevant part:

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, *or* D are satisfied.
>
> ….
>
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
>
> ….

 20 C.F.R. pt. 404, subpt. P, App.1, § 12.05 (as effective on Sept. 15, 2014).

Thus, to meet Listing 12.05(C), a claimant must show "(1) significantly subaverage general intellectual functioning; (2) deficits in adaptive functioning initially manifested during the developmental period before age 22; (3) a valid verbal, performance, or full scale IQ of sixty through seventy; *and* (4) a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Adkins v. Astrue*, 226 F. App'x 600, 605 (7th Cir. 2007) (emphasis added).  With respect to the second prong, the Seventh Circuit has defined "deficits in adaptive functioning" as

an "inability to cope with the challenges of ordinary everyday life." *Novy v. Astrue*, 497
F.3d 708, 710 (7th Cir. 2007).

Here, in assessing Listing 12.05, and particularly the "C" criteria, the ALJ first
doubted Claimant did in fact have a full scale IQ between 60 and 70. The ALJ
acknowledged that the results of the WAIS-IV administered by Dr. Knopf revealed a full
scale IQ of 65. However, the ALJ pointed out that "the consultative examiner noted
validity issues, stating that these scores should be considered only a minimal reflection
of her actual ability because she did not seem motivated to do her best and was
minimally cooperative." (R. 27.)

Notwithstanding the validity issues of the IQ score (element 3 above), the ALJ
also opined that Claimant did not demonstrate subaverage general intellectual
functioning (element 1) or deficits in adaptive functioning (element 2) "due to her
capabilities in her activities of daily living and social functioning" as described in his
opinion. *Id.* Throughout the opinion, the ALJ acknowledged that Claimant at times
needed assistance from her mother with some basic activities, but often cited to her
ability to: shower and groom independently; perform some household chores; maintain
healthy relationships with her family; work part-time during high school without any
reported difficulty; and attend Chicago State as a motivated full-time student. Lastly, the
ALJ stated that Claimant does not suffer from a physical or mental impairment imposing
additional and significant work-related limitation of functions (element 4), though he did
not elaborate further on this point.

Like Claimant, the Court is concerned with the ALJ's overall step three
assessment regarding listing 12.05(C). First, with respect to the IQ score, Claimant's

full scale score from the IQ test with Dr. Knopf does indeed place her in the parameters of Listing 12.05(C), which requires a range of 60-70.  Though Dr. Knopf -- and then the ALJ -- questioned Claimant's effort and motivation during the exam, Dr. Knopf still went on to diagnose Claimant with "mild mental retardation," as opposed to deferring a diagnoses or making a less limiting assessment.  As Claimant points out, this fact clearly differentiates this case from those in which a Claimant's performance raised questions of validity, *and* the examining physician deferred any intellectually disability diagnosis, or otherwise assessed a less limiting disorder.  *See Adkins*, 226 F. App'x at 605 (examining physician questioned Claimant's results *and* refrained from making a diagnosis of intellectual disability); *see also Maggard,* 167 F.3d 376, 380 (7th Cir. 1999). Here, not only did Dr. Knopf ultimately assess "mild mental retardation," but in discussing Claimant's scores for each category of the IQ exam, he described the resulting limitations Claimant may exhibit given her extremely low range of scores. Further, Dr. Knopf did not specifically explain whether Claimant's IQ scores could be considered valid and consistent with the Claimant's developmental history and the degree of functional limitation.  20 C.F.R. § Pt. 404, Subpt. P, App. 1 (dictating that a narrative report accompanying IQ scores should include such a discussion).

Seeing as Dr. Knopf's concerns about validity conflicted directly with his ultimate assessment, the ALJ should have addressed any concerns regarding whether Claimant "made a bona fide effort in taking the test," by reaching out to Dr. Knopf for further clarification or ordering another IQ test.  *See Wright v. Astrue*, No. 4:10 CV 35, 2011 WL 1486208, at *7 (N.D. Ind. Mar. 31, 2011), report and recommendation adopted, No. 4:10-CV-35-TLS, 2011 WL 1483372 (N.D. Ind. Apr. 19, 2011).  On the whole, the ALJ's

decision to rely on Dr. Knopf's conflicting report to discredit the only IQ score in the record is without substantial support.

As for assessing the "deficits in adaptive functioning" requirement of Listing 12.05(C), the ALJ concluded that Claimant did not meet this element "due to her capabilities in her activities of daily living and social functioning." (R. 27.) While the ALJ emphasized some of Claimant's successes, such as being a motivated student, working part-time in high school, and obtaining a college scholarship, he undermined her complaints of difficulties in daily life without adequate consideration. For example, Claimant testified that she does not take public transportation or shop alone, at times has trouble dressing herself properly, could not maintain her work study position at Chicago State, and failed two classes because she did not get the individual attention she requires. On this record, where Claimant's successes are marred by potentially severely limiting IQ scores and clear difficulties in daily life, further analysis from the ALJ is required. *See Miller v. Colvin*, No. 3:13-CV-380 JD, 2014 WL 4105034, at *14 (N.D. Ind. Aug. 19, 2014) (ordering remand where, among other things, ALJ failed to acknowledge Claimant received low and failing grades in main stream classes); *Deboer v. Colvin*, No. 15-C-194, 2015 WL 6872344, at *9 (E.D. Wis. Nov. 9, 2015) ("A claimant's graduation from high school does not preclude a finding of intellectual disability…Nor do periods of employment, such as [Claimant's] brief stint working at the deli counter.") (citations omitted); *but see*, Adkins, 226 F. App'x at 5 ("The fact that [Claimant] was able to be gainfully employed until the age of forty-one without material complaints from his employers further exemplifies his adaptive abilities.").

Lastly, despite recognizing bipolar disorder as an additional severe impairment at step two, the ALJ stated in a conclusory fashion that Claimant "does not suffer from a physical or mental impairment imposing additional and significant work-related limitation of functions." (R. 27.) Because this element of the Listing only requires a Claimant to "show that her impairment imposes more than a slight or minimal restriction on her ability to work," further analysis is required. *Hamilton v. Colvin*, No. 14 C 1672, 2015 WL 4729222, at *5 (N.D. Ill. Aug. 10, 2015). Additionally, while Claimant admitted her mood swings and symptoms are well-controlled on medication, there is evidence in the record that she stopped taking her medication on several occasions. This is not surprising given her bipolar diagnosis. *See Kangail v. Barnhart*, 454 F.3d 627, 630-31 (7th Cir. 2006) ("[I]t is true that bipolar disorder is treatable by drugs. But mental illness in general and bipolar disorder in particular... may prevent the sufferer from taking her prescribed medicines…"). The ALJ is reminded to take this factor into consideration on remand.

For all of these reasons, this case is remanded to the SSA for further consideration on the issues discussed herein. *See Booker v. Colvin*, No. 2:15-CV-00070-JMS-WGH, 2015 WL 9581842, at *5 (S.D. Ind. Dec. 30, 2015) (remanding for a more thorough assessment of Listing 12.05(C)). However, to be clear, guidance from the newly enacted Listings dictates that, on remand from the Court, the ALJ should apply the new Listings "to the entire period at issue" in any subsequent decision. Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138-01 (Sept. 26, 2016). The ALJ is expected to fully develop the record with any additional

information or testing that is necessary to assess Claimant's condition under the new Listing.

## III. CONCLUSION

For the foregoing reasons, Claimant's request for summary judgment is granted and the Commissioner's request for summary judgment is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion. It is so ordered.

_____
**Michael T. Mason**
**United States Magistrate Judge**

**Dated: February 15, 2017**